IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Theresa Beat, Executor of the
Estate of deceased Darrel Dean Dyche,

Plaintiff,

vs.                                         Case No. 08-1267-JTM

United States of America.

Defendant.

MEMORANDUM AND ORDER

This is an action by Theresa Beat as Executor of the Estate of Darrel Dean Dyche, seeking a refund on estate taxes. The case represents a continuation in the lengthy litigation between Beat and the government and centers on the contention advanced by Beat after Dyche's death that the two were common-law husband and wife. Three motions for summary judgment are now before the court.

In the first motion (Dkt. 62), Beat seeks a determination that she was the common-law wife of Dyche, thereby entitling her to a refund based upon the martial deduction. In the second motion (Dkt. 67), plaintiff argues alternatively that, if she is found to have been Dyche's common-law wife, the estate is entitled to claim deductions for administration expenses in the form of attorneys' fees, accounting fees, executor commissions, and interest expenses. The United States has filed a separate

motion for summary judgment (Dkt. 63), seeking a determination that Beat and Dyche were not married under common-law.

***Findings of Fact***

Beat filed a declaratory judgment action in the District Court for the Thirtieth Judicial District of Kingman County, Kansas, *In re Marriage of Dyche and Beat*, Case 2005-CV-13 (Dist. Ct. Kingman County, KS). The parties filed cross-motions for summary judgment, and the state district court granted summary judgment in favor of the United States in October of 2006, holding that Beat and Dyche were not common-law married as a matter of law. In August of 2008, the Kansas Court of Appeals reversed and remanded, holding that the question of common-law marriage was a fact question. *In re Marriage of Dyche and Beat v. United States*, 2008 WL 3367565 (Kan. Ct. App. 2008).

On remand, the issue before the district court was whether Beat and Dyche were common-law husband and wife. At the time of the remand, the matter of an estate tax refund was not ripe, since the Dyche Estate had yet to file a claim for refund at that time, pursuant to 26 U.S.C. (I.R.C.) § 7422(a).

Theresa Beat and Dean Dyche of Cunningham, Kansas, had a romantic relationship for over twenty years, beginning in 1975 while they were both married to other people: Beat to Gilbert Beat and Dyche to Caroline Dyche. This affair led to divorce in both of their prior marriages: Beat's on January 23, 1980, and Dyche's on August 15, 1980.

Beat and Dyche never had a marriage license from Kansas or any other state.

It is not controverted that Beat and Dyche would have had the capacity for marriage by September, 14, 1980, after the finalization of their divorces and expiration of the subsequent mandatory waiting period.

Beat testified that after she and Dyche obtained their respective divorces, they traveled to Hutchinson in the early 1980's for their "honeymoon." Beat stated Dyche carried her across the threshold of the Hutchinson motel and introduced her to a waitress as his wife.

With respect to the Hutchinson trip, the government notes that Beat could not remember when the trip occurred, other than that it was "probably" "right after" their divorces, and thus might have been before the time when the parties had capacity to marry. (*Id*. at 1.57). Further, Beat was asked in her deposition why, if the trip was indeed a "honeymoon," Dyche later proposed to her on two separate occasions, Beat responded "[t]hat's just the way he was. And I just - I couldn't answer him when he asked me. All I could think of was what if my kids say something that you're not my dad or – I – he'd been hurt. And I didn't want that to happen." (*Id*.).

Dyche gave Beat two rings, "one of them in the '80s and the next one probably in the '90s." (*Id*. at 1.70). Beat wore one of these rings on her left hand.  Beat also testified that when Dyche gave her a diamond ring in 1991, she asked "does that mean we're common-law? He says, yes. So, I know that don't - I mean - thought we were common-law from the beginning, you know, and I think in his mind did, too, but this just topped it off." *(Id*. at 73-74).  Another ring given by Dyche to Beat depicts an oil well with diamonds inset, which Beat calls her wedding ring. She acknowledged in her deposition that Dyche did not refer to the ring as a wedding ring.

When she appeared in public with Dyche, Beat wore the ring he gave her in the early 1980's and later the ring he gave her in 1991 on the ring finger of her left hand. She wore the ring except

during harvest or when working in the field. Unless his fingers were swollen, Dyche wore a ring which Beat had given him.

Dyche executed a will on or about May 14, 1992, naming Beat as the sole beneficiary and executrix of his estate. Six years later in 1998, Dyche revised his will to add four of Beat's children as alternate beneficiaries should Beat predecease him.

The government has admitted that Beat and Dyche were monogamous and faithful to each other after 1980.

When asked if she recalled if there was any time, besides the trip to Hutchinson, that Dyche referred to her as his wife, Beat testified: "Not right off hand. He might have called --called me his old lady sometimes, I don't know, because we were always together. Better half." (Beat Dep. 2-101). Beat was asked: "Were there any times when you referred to Dyche as your husband?" She replied: "No. People asked him all the time: Where's your other half? When I wasn't with him. And same to me: Where's your other half?" *(Id.* at 101-02).

Dyche and Beat were known by most throughout the community as "Dean and Theresa." Within their community, Dyche and Beat played pool together, and typically appeared together in public and at social events. Warren Meireis, a teacher at Cunningham High School who taught each of Beat's kids, testified that Dyche and Beat together attended "every school function at parent/teacher conferences" and "all school activities" for the kids through the years. (Warren Meireis Dep at 6). He added, however, that "to the best of my knowledge they weren't married." (*Id.* at 7).

Beat worked hard every day on the farms and was at Dyche's side during all the seasons of the year. During the farming season and at other times, when she was not working in the fields, Beat

would wash Dyche's clothes, do the cooking, send lunches out to the fields, and performed a farm wife's functions.

David Borho, a farm equipment dealer at Kincheloe's in Pratt, knew Dyche and Beat as customers for approximately 30 years and believed they were married because they acted like man and wife. He was on a first name basis with Beat. Phil Harmon saw Dyche and Beat together so often that he didn't know Beat's last name was "Beat." He assumed it was "Dyche." Kent Moore, who went to school with Daniel Beat, one of Beat's sons, testified that Dyche and Beat "did everything together as husband and wife." (Moore Dep. at 5). The government notes that these witnesses testified that Beat and Dyche never affirmatively indicated they were married.

According to Beat, when her children were still young and at home, she stayed the night at her house located at 219 West Third, although on "a few nights" she would stay with Dyche. (Beat Dep at 1.80). When Beat did spend the night with Dyche, she left her car at her house, so no one would know she was sleeping with him.

Dyche's mother, Iva, died on February 19, 1987, and Beat then spent a lot of time at the home at 111 East 4th Street caring for Dyche's father. Beat testified that Dyche's parents did not think she and Dyche were married.

Once Beat's children grew up and left, sometime around 1992, she kept the house at 219 West Third. By that time, Dyche was living almost exclusively at the home of his parents in Cunningham.

Around December 1996, James Kelley, who lived near Dyche's farm, met Dyche and Beat for the first time. Outside the presence of Beat, Dyche introduced himself to Kelley and "then he introduced me to his wife, Theresa." (Kelley Dep. at 7). On several later occasions when Kelley saw

Dyche, Dyche referred to Beat as "His Mrs." (Kelley Dep. at 9).

Dyche also introduced Beat as his wife to Rebecca McReynolds.

Before all of her children moved out of the house, Dyche and Beat spent about ten to twelve hours a day together. Beat has testified that during this time period they had a romantic relationship but did not live together. She did not think they were married because she thought "you had to have this piece of paper saying you were." (Beat Feb 28, 2006 Dep. at 95). After she spoke with Cobb, she testified, she believes she and Dyche were common-law married.

Beat also testified, that after her children moved out of the house, she usually spent about 24 hours a day with Dyche. She testified that she saw Dyche in the morning, worked with him in the fields, had lunch with him, went out with him at night, and would spend evenings with him. (Beach June 29, 2009 Dep. at 47). She testified that, prior to Dyche's death, she and Dyche "were together all the time and we wore our rings." (*Id*. at 48).

However, the government notes that this testimony is inconsistent with Beach's 2006 testimony that Dyche lived at 4438 N.W. 180th Avenue from 1980 to 1992, and at 111 E. 4th Street until his death, that she spent the winter months at her own home at 219 West Third, that she kept her furniture and her clothes at her own home, and that when she did spend the night at Dyche's house, she left her car at her own home so that no one would know she was sleeping with him.

Beat testified that "He [Dyche] was our world. He was all we had. And, I was all he had." (*Id*. at 49). Dyche bought blankets, dishes, and clothing for her children. She testified, "He did everything for us." (Beat Feb. 28, 2006 Dep. at 64). The government notes, however, that Beat paid her own grocery and utility bills, and Dyche did not pay for the education of Beat's children.

Dyche walked two of Beat's daughters, Debbie Royer and Karen Hampton, down the aisle

at their weddings on April 27, 1991, and September 20, 1997, respectively. The four Beat children that lived with her considered Dyche a father figure.

However, neither Royer nor Hampton, nor any of Beat's other five children identified Dyche as Beat's husband on their wedding invitations. If she had been asked who Dyche was when he was alive, Royer would have said, "He was my mom's boyfriend, my mom's significant other, my mom's life." (Royer Dep. at 11-12).

On Father's Day, Beat's daughter Karen Hampton twice sent Dyche a cards saying in one that he had been like a father to her, and in another that she considered him family. Another daughter, Kathy Schrock sent Dyche a card saying "Happy Father's Day Dean! Have a great day!" (BEAT0114-15 at Attachment 10). On one of his birthdays, Schrock also sent Dyche a card saying "You are like the father I never had before." (BEAT0116-17 at Attachment 11)

In contrast, the four children Beat identified as persons to whom she and Dyche held themselves out as married each testified that neither Dyche nor Beat ever said that they were married. Two of those children, Daniel Beat and Debbie Royer, also testified that during Dyche's lifetime they thought of him as Beat's boyfriend, not husband.

Dyche maintained three safety deposit boxes at the First National Bank in Cunningham. Beat was an authorized signatory and could come into the bank at any time and have access to the boxes. Beat did not access two of these boxes, Nos. 124 and 285, until after Dyche's death. Because she was not a co-lessee, after Dyche's death the bank required her to obtain a court order granting her access to all three boxes.

On or about January 6, 1997, Dyche designated Beat as the 100% primary beneficiary of his Individual Retirement Account. On the beneficiary form, Dyche referred to Beat as his "friend."

(Plf. Exh. 18.)

In support of her motion, Beat states that Dyche informed her his relatives would be upset when they discovered he had named her as the sole beneficiary of his estate and had not left anything to his remaining family members. The government objects to the cited fact as hearsay, because the cited source is Cobb's testimony of what Beat told him about her conversation with Dyche. In her Reply, Beat contends that the statement is admissible under Fed.R.Evid. 803(3) as reflecting Dyche's present state of mind. (Dkt. 77 at 19).

The evidence is not admissible on the ground cited. Fed.R.Evid. 803(3) excludes from the definition of hearsay:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Beat's direct testimony could be admissible as a statement of Dyche's "belief … relat[ing] to [his] will." The cited testimony, however, is double hearsay, purporting to state what Cobb heard from Beat about what Dyche said. Cobb's statement of what Beat told him is also hearsay, and Beat cites no relevant exception.

Beat alleges that a common-law marriage existed between her and Dyche sometime in 1980. But she has also testified that she "didn't know anything about common-law" and had just assumed that "if you was together as long as [she and Dyche] were, you are automatically common-law." (Beat Dep. a1. 78). She testified that it was after speaking with Cobb that she learned she might have had a common-law marriage

Beat's initially responded to inquiries at the funeral home by stating that she was Dyche's "companion," rather than his wife, and that Dyche should be listed as "divorced." On a form completed for the funeral, the line for "surviving spouse" was left blank.

During the period that Beat alleges they were married, she and Dyche identified themselves on several deeds as "single." Specifically:

a. On March 2, 1998, Dyche transferred property to Beat in a Corrective General Warranty deed in which he identified them both as "single persons." (Def. Resp. Exh.52).

b. Beat sold property to Rebecca and Richard McReynolds on December 23, 1997. Beat signed this deed, identifying herself as "a single woman" and the grantees as a married couple. (Def. Resp. Exh.124).

c. In a deed from Maurice and Bernice Lawson to Beat and Dyche, dated February 1, 1997, the Lawsons are denoted as "Husband and Wife," whereas Beat and Dyche are each denoted as a "Single Person." (Def. Resp. Exh.24). Beat did not object to this phrasing. (Beat Dep. at 1.186-87).

d. In a deed from Jean Wilson to Dyche, dated April 4, 1994, Dyche is denoted as a "single man." (Def. Resp. Exh.43).

e. A deed from Farm Credit Bank of Wichita to Beat, dated February 10, 1993, refers to her as "a single person." (Def. Resp. Exh.25). Beat admits that she and Dyche "probably" told the Farm Credit Bank she was single. (Beat Dep. at 1.188).

f. In a deed from Dyche to his father, Dayton Dyche, dated January 2, 1991, Dean Dyche is denoted as a "single man." (Def. Resp. Exh.45).

g. Federal Land Bank of Wichita transferred property to Dyche in a deed, dated May 20, 1986, identifying him as "a single person." (Def. Resp. Exh.30).

Neither Beat nor Dyche's attorney David Gaumer, who reviewed several real estate transactions for him, ever heard Dyche object to being called "single" in any deed.

According to Beat, identifying himself as single was "just the way [Dyche] did things."

Q. Do you know whether Mr. Dyche had a problem with his being identified [in a deed] as a single person?

A.  I don't know that. I doubt it.

Q.  Why do you doubt it?

A.  I don't know. That's just the way he did things.

Q.  Did you ever see him identify himself in writing as a married man during the time of your relationship?

A.  I don't recall, no.

(Beat Dep. at 1.218).

In designating Beat as the beneficiary of his SEP-IRA on January 6, 1997, Dyche described her as his "friend"— not wife. (Def. Resp. Exh.18).

As noted earlier, throughout the period of the alleged common-law marriage, Beat and Dyche reported on their separately filed federal income tax returns that they were not married, and IRS records, which go back only as far as 1988, reveal that for years 1988 to 1991, Beat, whose children were still living at home then, reported her filing status as unmarried "head of household;" thereafter, until Dyche's death, she reported her filing status as "single." For Dyche, IRS records show that he filed as "single" from at least 1988 until 2000, the last return he filed shortly before he died. Kansas Department of Revenue records, which go back only as far as 1997, reveal that for tax years 1997 until 2000, both Dyche and Beat claimed a marital status of "single" on their Kansas income tax returns.

Beat and Dyche signed their federal income tax returns as follows:

Under penalties of perjury I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete.

(Beat Dep. 1.162).

Similarly, Beat and Dyche each reported their marital status as "single" on their separately filed Kansas income tax returns. The Kansas Department of Revenue retains records for only ten years. Those records reveal that from 1997 until 2000, both Beat and Dyche filed their state income tax returns as "single."

In applying for retirement benefits from the Social Security Administration (SSA) on November 21, 1995, Dyche reported his marriage to Caroline Dyche but no other marriages.

At the direction of her attorneys, Beat filed a joint federal income tax return for her and Dyche for 2001, the last year of Dyche's life. This is the first time Beat ever reported being married to Dyche. It is uncontroverted (Fact ¶ 146 and Reply at p 36) that Cobb suggested the use of an accountant other than Beat and Dyche's longtime return-preparer, Jim Hill, because Hill knew that Dyche and Beat were not married.

Working with this new accountant, Daryl Blick, scared Beat "to death" because he told her he had never done a farm return before. (Beat Dep. at 1.158). On the Dyche Estate's federal estate tax return, Beat claimed the marital deduction for Dyche's bequest to her of his entire estate, thus reporting no estate tax liability.

As noted elsewhere, Beat testified that she did not "necessarily" think she was married to Dyche, because "I thought you had to have this piece of paper saying you were." (Beat Dep. at 1.95). Asked if Dyche considered her his wife, Beat testified: "As far as I know, he did. He never dated anybody else." (*Id*. at 6). Beat was also asked about what she and Dyche said about the relationship:

Q.   But did he ever tell you, you're my wife?

A.   No.

Q.   Did you ever tell him, you're my husband?

A.   No.

(*Id*.)  The only time Beat ever heard Dyche call her his wife was once on the trip to Hutchinson. She

never again heard Dyche call her his wife. As noted above, Dyche sometimes referred to Beat as

"the old lady" or "his better half."

According to Beat, twice in the early 1980s, after their trip to Hutchinson, Dyche asked her

to marry him, but both times she did not answer. She did not agree to Dyche's marriage proposals

because she was concerned that her seven children (all born into her marriage with Gilbert Beat)

would be disrespectful to Dyche if they were married, and because Dyche and Beat were divorced

Catholics, and Beat believed the religion prohibited remarriage

After her divorce from Gilbert Beat, Beat continued to use his last name never using the last

name "Dyche" or reverting to her maiden name. She stated that this was to avoid inconvenience and

obtain favorable financial benefits: "It just wasn't convenient at the time with all the kids and

everything. And I don't think the kids would have got grants for college if I'd had his last name."

(Beat Dep. at 1.74). By 1992, all of Beat's children had grown and left home, but still she did not

take Dyche's last name.

Beat testified that sometime in the 1990's, she told Dyche that she "would like to have his

name before [she] died" because she "didn't want to go to the grave being a Beat." (*Id*. at 1.77). In

response, Dyche "just laughed. Just grinned. He didn't say anything." (*Id*.) She testified that, had

she and Dyche had a ceremonial wedding, she "probably" would have taken his last name. (*Id*. at

178).

Beat's daughter Debbie Royer testified that Beat was "reluctant[]" to continue to use her

ex-husband's last name. (Royer Dep. at 17). She also testified that the custom in the Cunningham

area is for women to take their husbands' last names, that all five of Beat's daughters followed that custom, and that Beat had followed that custom when she married Gilbert Beat.

Beat and Dyche did not have any joint bank accounts and neither was authorized to sign the other's checks. Dyche, who had no credit cards of his own, was not an authorized user of any of Beat's credit cards. While Beat and Dyche helped each other farm, they split the profits according to who owned the land on which the crops were grown: if Dyche owned the land, then he kept all the profits, and if Beat owned the land, she kept all the profits. For the few parcels they owned jointly, they split the profits, with half going to Dyche and the other half to Beat. Payments from an escrow agreement Beat and Dyche had with Connie and Eugene Oak were made separately to Beat and Dyche, with each receiving a check for half the payment.

Beat has acknowledged that, during his lifetime, she and Dyche tried to keep their relationship "somewhat secret or confidential." (Beat Dep. at 1.86). In her Reply, Beat cites the facts that (a) she wore the ring which she called her wedding ring, (b) her having sexual relations with Dyche, (c) and their working together on the farm and attending social events. However, as to the ring, there is no evidence Beat called it a "wedding ring" in front of anyone else. The other factors cited are consistent with a common-law marriage, but also consistent with any long-term romantic relationship, even where there is no marital intent. Further, the evidence is uncontroverted that Beat attempted to conceal the existence of the sexual relationship.

Beat never told her family that Dyche was her husband, not even her six siblings, most of whom live within an hour of Cunningham. She does not know whether her relatives thought they were married. Beat replies that "it would have been natural for her not to have referred to herself as

Dyche's wife," since she did not then "understand the legal ramifications of her common-law relationship with Dyche." (Dkt. 77 at 42).

Two points are relevant here. First, on the relatively few occasions across two decades when the Dyche relationship is described as marital, the plaintiff actively cites such occasions as support for the finding of a common-law marriage. The court finds that the consistent avoidance of such language indicating a martial relationship to close family members is highly probative of Beat's intent. Second, it must be borne in mind that it is the plaintiff who has moved for summary judgment seeking a determination that a common-law marriage existed. Determining why Beat remained silent is a question of fact which is reserved for the jury.

Beat's son, Daniel Beat, did not think that his mother and Dyche were married. Neither his mother nor Dyche ever told Daniel Beat that they were married, and he never heard them refer to each other as husband and wife. When asked how he would have identified Dyche before Dyche's death, Daniel Beat responded, "I'd probably said he's my mom's boyfriend." (Daniel Beat Dep. at 34).

Beat's daughter Royer testified similarly. She testified that Dyche was "the stepfather figure in my life," but when asked how she would have described Dyche during his lifetime, she responded: "He was my mom's boyfriend, my mom's significant other, my mom's life." (Royer Dep. at 11). As Beat observes in her Reply, elsewhere in her deposition Royer testified that she believed Beat and Dyche were married, but when asked why she believed this, she stated it was "[b]ecause after our Mom and Dad got divorced he became the rock in our life. He provided for us. He was there for us. He was by my Mom's side all the time." (*Id*. at 4-5). Again, these are circumstances which are consistent with a common-law marriage, but also consistent with any long-

term romantic relationship. Asked specifically whether Dyche described Beat as his wife, Royer testified that he did so on one occasion when she met Dyche and Beat at the VFW. Notably, however, Royer testified that Dyche made this introduction in "a joking manner." *(Id.)* At that time, Royer was still living at home with her mother, and Dyche did not live with them. Royer never heard her mother refer to Dyche as her husband.

Two other siblings, Schrock and Hampton, both testified that they never heard either Beat or Dyche say that they were married or refer to each other as husband or wife.

Beat's ex-husband Gilbert Beat, who also lives in Cunningham, never heard that Beat had re-married.

None of Beat's seven children's wedding invitations identified Dyche as Beat's husband.

On her children's applications for college financial aid, Beat did not report that Dyche was her husband.

Dyche was both an only child and childless.

Beat testified that Dyche tried to keep their relationship hidden from his family. Beat and Dyche often visited his parents, who also lived in Cunningham. She took care of Dyche's father when he was ill, and described his mother as being nice to her. Beat testified, however that his parents, who died in 1989 and 1991, did not think she and Dyche were married.

In her Reply, Beat objects to this last point as hearsay, even though it her own admission as a party opponent. Further, it is not clear that Beat's testimony relies on any out-of-court *statement* by Dyche's parents which is now being used to *prove the truth of the matter asserted* (e.g., "You and our son are married"), as opposed to some other communication not used to prove the truth of the matter asserted (e.g., "Why don't you two get married some day?"), or indeed not even premised

on any communication by Dyche's parents at all. That is, Beat was testifying about the parents' lack of knowledge, not based on what the parents may have said, but based on her own knowledge of carefully avoiding the use of marital language in their presence.

Dyche's cousin Brenton Bortz knew that Dyche and Beat were not married. Farming land adjacent to Dyche's, Bortz saw him about once a month and spoke to him often. He saw Beat and Dyche "together all the time," (Bortz Dep. at 16), but he never heard him call Beat his wife or say that they were married. Indeed, in the early 1990s, Dyche told Bortz that he would not remarry because "if he was to leave any property to a woman it was going to be because he wanted to, not because he had to." (Def. Exh. 517 at ¶ 6).

Neither Beat nor Dyche ever told Dyche's cousin Monte Rose, who lives in Cunningham and attended Dyche as an Emergency Services Technician at his death, that they were married.

After their divorce, Dyche remained on friendly terms with his ex-wife, Caroline Dyche. He mowed her lawn, farmed her land, and did other tasks for her. Dyche told Caroline Dyche that he and Beat were not married:

> Q.  Did you ever talk to anyone who suggested to you that Dean and Theresa were married?
>
> A.  I really didn't talk about it. I asked Dean why he didn't marry Theresa, I thought he wanted her. But he says, I'll never get married. That's the answer he gave me. And that was the only time we ever had any conversation about it.

(C. Dyche Dep. at 27). Caroline Dyche receives survivor benefits from the SSA as Dyche's surviving spouse. Beat does not.

The government notes that Beat testified that throughout Dyche's life, she and Dyche maintained separate residences, both in Cunningham. Beat's home is, and has been since 1980, at 219 W. 3rd Street. Dyche lived at 4438 N.W. 180th Avenue from 1980 to 1992, and then at 111 E.

4th Street until his death. In her Response, Beat notes that in another portion of her deposition, she testified that she lived at the 4th Street house after 1992.

According to Kathy Schrock, Dyche did not spend the night at Beat's house.

Beat admits that while her children were living with her, she did not live with Dyche. After her children had all left home in approximately 1992, she began sleeping over at Dyche's house.

Beat did not live at Dyche's house all the time, however, but stayed there mainly during the summer, spending the winter at her own home. When she did stay at Dyche's house, Beat left her car at her own home so that no one would know she was sleeping with him. In her own words:

> [My home] was two blocks away from his house, so I had my vehicle there and walked to his house. That way nobody knew if I was there or not. We were just very private people; we just didn't want everybody else to know.

(Beat Dep. at 1.83). Beat kept most of her clothing and her furniture at her own home, not Dyche's.

Beat and Dyche used separate mailing addresses. They each paid their own utility bills and grocery bills.

Beat's son, Daniel Beat, who has lived in Cunningham most of his life, testified that he does not believe people in Cunningham thought his mother and Dyche were married. The plaintiff objects to this evidence as hearsay, but the court finds that the testimony is admissible as evidence of reputation directly relevant to an element of common-law marriage – how the couple was perceived in the community.

The Cunningham Pride Committee holds an annual Christmas decorating contest, the Pride Lighting Contest, which Beat and Dyche won in alternating years: Beat in 1997, Dyche in 1998, Beat in 1999, Dyche in 2000, and Beat in 2001. A member of the Cunningham Pride Committee, Jack Meyers explained that the contest rules provided that "a winning family or household in one

year could not be included in the competition the following year." (Exh. 152 at 5080). The purpose of this rule was to spread the prizes around and specifically to prevent Dyche—a frequent winner—from winning every year. Had Dyche and Beat been married, they would have been precluded from winning in consecutive years.

Jack Meyers of the Pride Committee stated that the community knew that "Theresa had her house and was living in it and Dean had his house and was living in it." (J. Meyers Dep. at 59). "No one looked at them as being married." (*Id*. at 60). Attorney David Gaumer, who judged the Pride Lighting Contest for several years, also testified that the rules would not have allowed Beat and Dyche to win in consecutive years had the judges understood them to be married.

Beat admits that the Pride Lighting Contest judges "probably" considered her and Dyche to be two separate households, and that she was aware contest rules precluded the same household from winning in consecutive years.

Meyers was the president of Cunningham's only bank, the First National Bank of Cunningham, for thirty years, and had business transactions with Dyche. Having known Dyche for more than fifty years, and Beat for almost as long, he knew that they were not married because "they had separate households." (J. Meyers Dep. at 19, 59). He never heard either of them say that they were married. As he explained, because Cunningham only has 600 residents, "if [Dyche and Beat] were married, they couldn't have kept it quiet, not in Cunningham." (*Id*. at 56). He did hear gossip, however, on the issue of why they did not marry.

Jack Meyers' son, Eric Meyers, worked at the First National Bank since 1992. He also knew Dyche as a member of the community and as a bank customer, and knew Beat for about thirty years, having gone to school with her children. He did not think they were married. He never heard that

they had remarried after their divorces, and never heard them say they were married or call each other husband or wife. He knew that they had separate residences and separate mailing addresses.

Bill Lenox, who owned the West Café in Cunningham for approximately nine years, from the mid-1980s until the mid-1990s, knew Dyche as a frequent—almost daily—customer, who generally dined alone. Lenox chatted with Dyche "a lot" and employed Beat for a few months in the mid-1990s. (Lenox Dep. at 6, 7). He knew Beat and Dyche were not married because "[t]hey never introduced each other as man and wife or didn't act man and wife. They both lived different places." *(Id.* at 15).

The minister who conducted Dyche's funeral, Reverend William McCary, who was also Dyche's neighbor for the last four years of Dyche's life, did not think that Dyche and Beat were married.

In all the business transactions Beat and Dyche engaged in during Dyche's lifetime, there were no deeds or other documents indicating that they were married. There are, as noted earlier, several deeds and other legal documents expressly stating that they were not married. By contrast, when Dyche was married to Caroline Dyche, that relationship was reflected in deed from Julia Stroot to them that identified them as "Husband & Wife." (Exh. 44).

William Terry was Dyche's stockbroker for twenty years, first at Fahnestock, then Oppenheimer. He also handled Beat's stock brokerage business. He knew they were not married and had separate mailing addresses. As they never gave him reason to believe that they were married, he managed their accounts individually—as separate files—and not together as he would for a husband and wife.

Dyche's 1997 application form for his Fahnestock & Co., Inc., SEP-IRA account reports "N/A" in the space provided for "Spouse or Other Joint Tenant(s)." (Exh. 17). Similarly, the "Spouse or Other Joint Tenant(s)" portion of Beat's 2000 Fahnestock application is blank. (Exh. 19).

Ulanda Stiebben was Dyche's insurance agent for more than twenty years, and handled his insurance for his home, his vehicles, his farms, and his farm machinery. Stiebben knew Dyche and Beat were not married, even though Stieben had seen them buying groceries together, because "[t]hey had different last names, they had separate homes, and they did not have anything titled together in so far as [Stiebben's] insurance business, and Dyche never came into her office with Beat." (Exh. 509 at 5086). Stieben never heard him refer to Beat as his wife or say that they were married. (*Id.*) Although Caroline Dyche had been on Dyche's insurance policies during their marriage, Dyche never added Beat to any of his policies, not even to list her has an additional household driver on his automobile policies. (Stiebben Dep. at 17-18). Stiebben could not recall a single client who did not add his or her spouse's name to insurance policies after marrying.

Dale Parsons, who worked at the Cairo Co-op for forty-one years, sold Dyche and Beat fertilizer, petroleum, and other farm supplies on several occasions. They never told him they were married and never used the terms husband and wife in his presence. They paid for their purchases separately and sold crops to the Cairo Co-op separately.

Beat admitted that their farm employees knew that they were not married:

Q.   The farm employees knew you were not married, correct?

A.   Yes.

Q.   They knew you were not married –

A.   Yes.

Q.   – to Mr. Dyche, correct?

A.   Correct. They knew we did not have a certificate.

Q.   Well, did you tell them you were married?

A.   No.

Q.   Did they know that you had a residence separate from his?

A.   Yes.

(Beat Dep. at 1.230).

For approximately twenty years, Beat and Dyche had their tax returns prepared by Jim Hill. Hill did not think they were married; they never told him they were, and he knew they did not live together because they used separate addresses on their returns. Accordingly, he prepared their tax returns separately with the filing status of "single."

Beat confirmed that Hill understood her and Dyche to be single:

Q.   Mr. Hill was under the impression that you two were single, correct?

A.   Yes....

Q.   Mr. Hill prepared federal income tax returns for your signature under penalty of perjury that stated that you were single; is that correct?

A.   I signed them as that.

Q.   And so Mr. Hill believed you to be single?

A.   Yes.

Q.   And believed Mr. Dyche to be single?

A.   Yes.

(Beat Dep. at 1.155).

On the Dyche Estate's federal estate tax return, which Hill did not prepare, Beat, as executrix, reported only one real asset that Dyche owned jointly with her. This asset was land she and Dyche purchased from Paul, Maudie, and Dale Miskimen on March 23, 2000. Neither the Miskimens nor their realtor, John Hamm, understood Beat and Dyche to be married, however.

In 1992, Dyche had attorney David Gaumer draft his will, leaving all his property to Beat and naming her executrix of his estate. Dyche did not identify her in this document as his wife or spouse.

Six years later, in 1998, Dyche had Gaumer revise his will to add four of Beat's children (Daniel Beat, Schrock, Hampton, and Royer) as alternate beneficiaries should Beat predecease him, and to designate Daniel Beat as an alternate executor. He made this change because he and Beat were going on vacation to Las Vegas, and he was concerned that they might both be killed in a plane accident. Again, in this will, he did not identify Beat as his wife or spouse.

When Dyche came into his office to execute the second will, Gaumer explained to him that if he and Beat married, his estate could avoid substantial estate tax liability by use of the marital deduction:

> I said, 'Dean, we really need to do some estate planning.' And I said, 'As far as estate planning is concerned, if you're going ... to Las Vegas, why not get married and that would ... solve the relationship of a husband and wife and you would have a marital deduction.'
>
> And his response to me was, "I don't intend to get married now or in the future."

(Gaumer Dep. at 1.15).

At this same meeting, Dyche told Gaumer that he was leaving sufficient assets for Beat to satisfy any estate tax liability:

Dean was never interested in estate planning.... [W]hen we discussed this on his will in '98 ... I said, "You could save a substantial amount of taxes if you were married."

And he said, "I've got plenty of property. There will be plenty of money to pay the taxes." So that was the extent of the conversation.

*(Id.* at 39).

Gaumer knew Dyche to be a "very" sophisticated businessman, "absolutely" aware that his estate would owe estate tax. *(Id.* at 77). Beat agrees with this assessment. Gaumer explained, "Dean hated taxes. He knew tax law upside down and backwards. And he knew how to farm the government, as far as government program payments were concerned." *(Id.* at 1.78).

Beat also had Gaumer draft her will. Although she met with him for this purpose around the same time Dyche did, her meeting was separate. In the will, Beat named Dyche as a beneficiary without referring to him as husband or spouse.

Gaumer, who has prepared numerous wills, testified that he generally prepares a married couple's will as a single document. Gaumer has never given advice as to whether a given relationship is a common-law marriage, but when he has prepared wills for a couple in any type of marital relationship, he always refers to them, whether common-law or civilly married, as husband and wife in their wills.

Dyche never discussed his will with Beat, other than to mention to her one day that he had "just made [her] a millionaire." (Beat Dep. at 1.94).

Dyche was executor of both his parents' estates. Notwithstanding this experience and his sophistication in business matters, both he and Beat believed that without a will, his property would pass to his blood relatives. According to Beat, the purpose of Dyche's will was to prevent this:

Q. Dyche wanted to make sure his relatives didn't get his property?

A. That's right.

Q. What exactly did he say to you about that?

A. I don't want none of those greedy SOBs to get anything of mine.... And I finally talked him into making a will out because if he didn't, that's where it would go. So, he did.

Q. But did you consider yourself to be his wife at that time?

A. We were together all the time.

Q. Did you consider . . . yourself to be his wife?

A. Not necessarily. I mean being his wife, I thought you had to have this piece of paper saying you were.

(Beat Dep. at 1.94).

In addition to her four children, Beat listed thirty-one people, only thirteen of whom reside in Cunningham, as persons to whom she and Dyche held themselves out as a married. However, she admits that she never told any of her witnesses that she and Dyche were married.

Beat has testified that the issue of whether Beat and Dyche were common-law married did not come up among Beat's family until after Dyche died. As Beat's daughter Karen Hampton explained, "It came up after Dean's death....  Dean has left mom everything. If we can prove they're common-law married, which they were in our eyes as far as I know, then she doesn't have to pay estate taxes or whatever." (Hampton Dep. at 32-33).

Dyche died of a heart attack the evening of July 14, 2001. At the time, Dyche and Beat were in bed together at the home located at 111 East 4th Street, Cunningham, Kansas.

The Kingman emergency medical services patient report lists Beat as next of kin. Dyche's cousin, Monte Rose, an emergency medical responder in attendance at his death, does not recall Beat identifying herself as Dyche's wife then or at any other time.

Beat met with Dennis Rasmussen at the Pratt Funeral Home and made the funeral arrangements for Dyche. Rasmussen thought Dyche and Beat were married, and he therefore initially intended to mark Dyche's death certificate as married. But at Beat's request, he marked the certificate as "divorced." Beat told Rasmussen that she was Dyche's "companion" because "I didn't know what else to put down." (Beat Feb. 28, 2006 Dep. at 112).

Rasmussen also testified that he understood Dyche and Beat had "lived together in separate homes," and that he assumed Beat was Dyche's "companion." (Rasumussen Dep. at 7, 18). He made this assumption because he never saw Beat and Dyche with anyone else, and neither Beat or Dyche ever said they were married.

The Family Record for Dyche's funeral states that he was married to Beat. Beat testified that she thinks the document was prepared after Dyche's death by Rasmussen, even though Beat had advised Rasmussen that she was Dyche's companion. Rev. William McCary, the minister who presided over Dyche's funeral where the Family Record was presumably displayed, understood that Beat and Dyche were not married.

Shortly after Dyche died, but before the funeral, Gaumer, the attorney who drafted Dyche's will and a longtime associate of Dyche's, came to Beat's home to discuss the handling of the estate. Beat asked him if she would qualify as Dyche's wife, to which he responded, "I don't believe that there are any facts to substantiate that you would be able to prove that you and Dean had a husband and wife relationship." (Gaumer Dep. at 1.12-13).

Beat and her daughter-in-law Kelly Beat have denied that Gaumer told them this.

After the funeral was over, the body was taken out for burial. Beat asked Jack Ebersole, the co-owner of the mortuary, if she could ride with Dyche's body to the burial site. During the ride to

the cemetery Beat asked Ebersole, "have you ever had a wife ride with their husband?" (Ebersole Dep. at 5).

Dyche has a "double hearted" tombstone inscribed with the names of Dyche and Beat. (Beat Feb. 28, 2006 Dep. at 125).

Beat received sympathy cards after Dyche's death. One card was addressed to "Mrs. Dean Dyche and family," another to "Family of Dean Dyche." (Cobb Exh. 7a, 7b). One card stated: "You and Dean were such a devoted couple." (Cobb 7c, Cobb 7d). A card to Beat's daughter Karen Hampton said: "We were so sorry to hear about Karen's step-dad." (Cobb 7g). Still, as Beat acknowledged in her deposition, she had never used Dyche's last name, and had never told anyone that she was Theresa Dyche or Mrs. Dean Dyche. (Beat Dep. at 1.78).

A few days after the funeral, Beat and some of her children went to Wichita to hire an attorney to assist in probating Dyche's estate. One of the firms they visited was Bever Dye, L.C. Bill Cobb of that firm told Beat that she should have the Death Certificate changed to reflect that she and Dyche were considered married. Beat returned to the funeral home to have the Death Certificate altered to show that Dyche was "married," and her name inserted as surviving spouse.

Beat has a high school education. She has testified that she did not know the legal consequences of being common-law married. She testified that she and Dyche considered themselves to be "common-law," but she described this in her deposition as merely a function of the duration of the relationship: "I figured if you was together as long as we were, why, you were automatically common-law." (Beat Feb. 28, 2006 Dep. at 78). In contrast, she understood that "we had to have that piece of paper to be really married." (*Id.*)

Beat testified she did not even consider the possibility of common-law marriage until after Dyche's death, and she realized the estate tax consequences of marriage. Karen Hampton testified that there was a family discussion after Dyche died about the tax benefits of claiming a common-law marriage. Dan Beat testified that the reason that common-law marriage was first discussed by the Beat family as a whole was because if they were not married, they would have to pay estate taxes. Beat testified that her daughter-in-law, Kelly Beat, mentioned the idea of common-law marriage to her before she visited Cobb at Bever Dye, and that being a common-law wife would benefit her financially. Beat she did not think that she actually was common-law married until after talking with Cobb.

Beat eventually hired Bill Cobb of Bever Dye, LC to probate Dyche's estate. Cobb was the responsible attorney for Dyche's estate, with the assistance of Julie Stanley, an associate with the Bever Dye firm at the time. At Cobb's request. Stanley prepared a research memorandum on the issue of common-law marriage in Kansas.

On July 20, 2001, Cobb had his initial conference with Beat and members of her family. The conference was at Cobb's office. Cobb is a senior partner at the Bever Dye firm, and is a CPA as well as an attorney. He has practiced law in the area of taxation and estate planning in Wichita, Kansas for approximately forty-four years. He has been licensed to practice law in Kansas since 1965 and has never had any type of ethical complaint filed against him. The United States has asserted a tax preparer penalty against Cobb in connection with his involvement in the estate tax return Form 706 signed by Beat, and could lose his license to practice law if the position of the IRS regarding the tax preparer penalty is ultimately upheld. This is the first penalty claim the IRS has advanced against Cobb.

Beat testified she relied upon the advice of Cobb and Stanley regarding matters related to Dyche's estate, trusted them, and did what they told her to do. She testified that she never misrepresented any information to Cobb or Stanley. In response, the government notes that the affidavit submitted by Beat stating that she had lived with Dyche for over 20 years was false, in that she later testified that she had only lived with Dyche after 1992, and even then not all the time.

As noted earlier, Cobb advised Beat at this meeting that the Dyche death certificate should be changed. Cobb asked Beat why she had told the funeral director to check the box divorced for Dyche's status and Beat responded that she "knew they were common-law married, believed they were common-law married, but didn't know that, that allowed her to say to the funeral director check married because they did not have a formal marriage … that's actually what she told me." (Cobb Dep. at 92). However, as noted earlier, there is also testimony by Beat that she did not think she and Dyche were common-law married until after meeting with Cobb.

Cobb told Beat that she and Dyche had a common-law marriage, and told her she should have the death certificate changed.

Beat gave Cobb pictures of family events that showed Dyche as part of the family and as part of two different wedding parties. Cobb asked Beat if Dyche had given her a wedding ring. She told Cobb that Dyche had given her two rings which she wore in public throughout her life. (*Id*. at p. 53:12-54:1; 95:13-22). According to Cobb, Beat told him that in 1991, she and Dyche "were at his parents house and Dean gave her a second wedding ring, and the conversation basically was this means we are common-law and Dean said yes; and Theresa said I thought we always was."

However, only Beat, not Dyche, referred to this second ring as a wedding ring. She testified: "He showed it to me in a box and he said I could have it. That was it." (Beat Dep. at 71). Further,

the conversation as reflected in Cobb's testimony – that Beat "always" thought they were common-law married – is contradicted by Beat's testimony that she did not think she and Dean were common-law married until after Dyche's death, and she had learned of the financial implications of such a relationship.

Beat also told Cobb some of the other events from her relationship with Dyche, and Cobb told her that there was a case for a common-law marriage. He asked Beat for an Affidavit, and to obtain other affidavits supporting the existence of a common-law marriage.

Beat states that she signed the federal estate tax return pursuant to the advice of Cobb and Stanley. Beat filed a joint federal income tax return for the year 2001 claiming "married" as her marital status.

Mark Wetta is an attorney for the Internal Revenue Service, Estate and Gift Tax Division, and he has served as an examiner regarding the estate tax return filed by Beat. In December of 2001, Marvin Thomas, a relative of Dyche's, met with Wetta and told him, in his opinion, there was not a common-law marriage between Dyche and Beat. Thomas completed Form 211 the IRS described as an "Application for Reward for Original Information" and presented it to Wetta.

Beat and Dyche never had a marriage license from Kansas or any other state authorizing them to marry each other.

From 1980 to 2000, Beat and Dyche both used the services of Jim Hill, a local accountant, who prepared both Beat's and Dyche's federal income tax returns. Jim Hill also prepared Beat's and Dyche's 2000 federal income tax returns on or about February 22, 2001, only months before Dyche died.

In all the federal income tax returns filed by Dyche and Beat after their respective divorces

and before Dyche's death in 2001, Dyche and Beat submitted no returns marked "married filing jointly."

In 2001, Cobb recommended that Beat hire a new accountant, Daryl Blick, to prepare and file her federal income tax return for tax year 2001. Blick prepared Beat's 2001 federal tax return without having any conversation with Beat about what her relationship was with Dyche. Cobb wrote to Blick stating that Beat and Dyche had a common-law marriage.

All federal income tax returns filed by Dyche and Beat after their respective divorces and before Dyche's death in 2001 reported that Dyche and Beat were not married. IRS records, which go back only as far as 1988, reveal that for years 1988 to 1991, Beat, whose children were still living at home then, reported her filing status as unmarried "head of household;" thereafter, until Dyche's death, she reported her filing status as "single." None of these federal income tax returns were audited by the IRS. IRS records reflect that Dyche filed as "single" from at least tax year 1988 until tax year 2000, the last return he filed before he died. None of these federal income tax returns were audited by the IRS.

Revenue Agent Martha TenEyck, 21-year veteran Revenue Agent with the IRS and agricultural facilitator for the IRS Wichita office is an expert in the field of accounting. The plaintiff disputes this characterization, but cites no evidence in support of the denial. Based upon her review of the 1988 to 2000 tax returns filed by Dyche and Beat, TenEyck found that Dyche and Beat paid less in taxes filing "single" or "head of household" than they would have if they filed "married filing jointly" or "married filing separately."

Neither before nor after Dyche's death did Beat or the Dyche Estate attempt to amend any of the 20 years worth of federal income tax returns filed by Beat or Dyche before Dyche's death

which claimed a status of "single" or "head of household." Beat and her attorneys considered amending Beat's and Dyche's prior open federal income tax returns to reflect the alleged marriage, but declined to do so because "it was not worth raising the common-law marriage issue in that venue." (Cobb Dep. 75-76).

In February or March of 2002, Beat filed a joint federal income tax return on behalf of her and Dyche as a "surviving spouse" for tax year 2001, claiming a status of "married filing jointly."

On April 8, 2002, Beat timely filed Form 706 United States Estate (and Generation-Skipping Transfer) Tax Return with the Internal Revenue Service Center, Covington, Kentucky. The Form 706 claimed a marital deduction and showed no tax being due. The IRS denied the marital deduction on March 17, 2005, and assessed additional estate taxes in the amount of $1,429,724.00, a civil fraud penalty in the amount of $1,072,293.00 under IRC §6663 and interest on the assessment and penalty in the amount of $434,697.34.

On June 10, 2005, Beat paid to the IRS, the assessment of additional tax, penalty and interest in the amount of $2,936,714.34.

On May 31, 2007, Beat filed a Form 843 Claim for Refund and Request for Abatement, seeking a refund of estate taxes, penalties, and interest paid by her in the amount of $2,934,301.77, plus additional deductions for legal fees, accounting fees, executor fees, and interest expenses incurred in connection with the examination of the estate tax return and required to fully accomplish the refund, with interest as provided by law. The claimed refund reflected the amount Beat paid on June 10, 2005, less $2412.51 of an interest reduction conceded to by the IRS. On June 11, 2007, Beat filed a second Form 843, seeking to take into account debts of Dyche for the 2001 federal and state income tax liabilities that were inadvertently not reported on the original May 31, 2007 claim

for refund.

The IRS disallowed the refund claim on August 4, 2008, pursuant to 26 USC § 6532. The disallowance notice stated that no common-law marriage existed, and cited the decision of the Kingman County District.

On March 8, 2005, Beat filed a Petition for Declaratory Judgment in the Kingman County District Court seeking a judicial determination that she was the common-law wife of Dyche. After extensive discovery, all parties moved for summary judgment, and on October 6, 2006, the District Court of Kingman County entered summary judgment against Beat finding that two of the three elements of a common-law marriage had not been met. Beat appealed the adverse Kingman County decision to the Kansas Court of Appeals, which reversed the award of summary judgment. The matter was remanded to state district court. Beat then settled the action with the Kansas Department of Revenue and dismissed the action.

The plaintiff cites extensive portions of the decision by the Court of Appeals, including its recitation of several factors as "compelling" indicia suggesting the existence of a common-law marriage, and further refers to the Court of Appeals decision as "the law of the case." It is not. This refund action is a *de novo* proceeding determining whether a refund is due. *Lewis v. Reynolds*, 284 U.S. 281 (1932). Further, the Kansas Court of Appeals' factual assessment was predicated on the facts presented to the Kingman County District Court, and the court's conclusion that some evidence was "compelling" was rendered in the context of whether the Kingman County District Court had correctly granted summary judgment *in favor* of the Kansas Department of Revenue. The Court of Appeals did not determine as a matter of a law that a common-law marriage existed, and in fact, the Court of Appeals remanded the action for further factual findings. The parties in this action have

produced an independent body of evidence in connection with the present motions for summary judgment, including depositions conducted in 2009, and the court must resolve the propriety of refund on that basis of that evidence.

Similarly, the plaintiff cites a series of responses by IRS examiner Wetta that he is not personally aware of information which would contradict various facts  she cites in support of her common-law marriage (e.g., that Dyche walked two of Beat's daughters down the aisle at their wedding). (Plf. Uncontr. Facts Par. 107-29).  The court agrees with the government that the cited facts are irrelevant. The present action are *de novo* proceedings to determine the propriety of refund, and the matter is accordingly not controlled by the extent of an IRS examiner's personal knowledge of the case.

As noted earlier, Dyche's funeral was held July 18, 2001. The same day, Beat's daughter-in-law, Kelly Beat, called Cobb to discuss the Dyche estate and whether a common-law marriage existed. Beat and family members met with Cobb and Stanley two days later. Cobb explained to Beat the Kansas requirements of a common-law marriage. Beat formally retained the law firm of Bever Dye on July 27, 2001. Cobb testified that at neither meeting did Beat or any member of her family describe what was said regarding Gaumer's discussion with Beat about common-law marriage. Cobb testified that "we asked if [Gaumer] would be of any assistance in proving up the common-law marriage and was told he would not be." (Cobb Dep. at 35).

Beat did not tell Cobb before filing the estate tax return that one of the reasons that she never took Dyche's last name was that it may have affected getting student loans for her children.

On July 30, 2001, Cobb and Stanley sent Beat a law review article which explained common-law marriage in Kansas, including the issue that "[s]peculation by witnesses that a couple

appeared to be married, as opposed to witnesses testifying that the couple advised that they were married ... falls short of the 'holding out' requirement." (Exh. 622 at TB01021). Nonetheless, Cobb drafted several affidavits for Beat and several of her children to sign regarding their impression of the relationship between Dyche and Beat.

Other than the affidavit that Cobb created for Beat to sign, Cobb did not talk to any of the persons for whom the affidavits were created. Before they were signed, no one told Cobb who the Beat family would get to sign Cobb's affidavits. Cobb told Beat that the affidavits needed to be signed under penalty of perjury.

Beat signed an affidavit stating that she had lived with Beat for 20 years, even though she did not live with Dyche until after 1992, when her children moved out. Beat never told this to Cobb. Beat later explained in her 2009 deposition that by "lived with" in the affidavit, she meant "spend[ing] as much time with him as you can," not necessarily living in the same house. (Beat June 29, 2009 dep. at 45).

In a letter approved by Cobb, Stanley wrote to Beat that the lawyers wished that the return should be supported by appraisals "to avoid the possibility of the IRS reviewing the estate tax return." (Cobb Dep. at 66; Exh. 630 at TB00982). Cobb advised Beat not to amend the federal income tax returns in which she claimed she was single because, "if we went back and filed amended returns for the three open years ... that could raise an issue." (Cobb Dep. at 75).

Although Dyche's ex-wife Caroline receives survivor benefits from the Social Security Administration as Dyche's surviving spouse, Beat's attorneys advised her not to seek surviving spouse benefits from the Social Security Administration, even though the amount involved is significant.

The Social Security Administration's preferred evidence of a common-law marriage when one spouse is dead includes signed statements from "two blood relatives of the deceased person" showing "why the signer believes there was a marriage." 20 C.F.R. § 404.726(b)(2) & note. If such evidence is not available, under§ 404.726(c) a claimant must explain this absence of evidence and supply "other convincing evidence of the marriage." Beat has not identified a single blood relative of Dyche to whom she and Dyche held themselves out as married. If Beat had been Dyche's widow, she would have been entitled to approximately $1,000 per month in SSA survivor benefits for the rest of her life. With a life expectancy of 84, those benefits would have be approximately $276,000.

With respect to plaintiff's separate, alternate motion for a deduction for administration of the expenses of the estate, it is uncontroverted that in the Claim for Refund and Request for Abatement Form 843 for Dyche's estate, Beat claimed an additional deduction on behalf of Dyche's estate in the amount of $5,760.00 under 26 U.S.C. 2053(a)(2) for administration expenses for accounting fees. In the same form, Beat claimed an additional deduction in the amount of $40,000.00 under 26 U.S.C. 2053(a)(2) for administration expenses for executor's commissions. She also claimed a deduction of $926,411.00 under 26 U.S.C. 2053(a)(2) for administration expenses for attorneys' fees related to the probate of the estate, the Kingman County Action, the appeal of the Kingman County Action to the Kansas Court of Appeals and the current federal refund action. These amounts represented $526,411.00 in fees paid and accrued as of the date of the filing of the Form 843 Claim for Refund and Request for Abatement on June 11, 2007, and an estimated $400,000.00 in fees to complete administration of the estate and the proceedings concerning the common-law marriage issue. Finally, Beat claimed a deduction of $755,660.00 under 26 U.S.C. 2053(a)(2) for administration expenses for interest expenses up to the date of filing of the Claim for Refund on June

11, 2007.

The Estate of Dyche has accrued additional attorneys' fees from the date of the filing of the Form 843 on June 11, 2007 up to the date of the filing of this motion and will continue to accrue attorneys' fees up to the date of judgment in this action. The Estate has accrued additional interest expenses from the date of the filing of the Claim for Refund on June 11, 2007 up to the date of plaintiff's motion, and will continue to accrue additional interest expenses at least up to the date of judgment in this action

In its response, the government does not contest the amounts cited for interest and account fees, or for executor's commissioners. It does argue that an award of attorney fees for prospective legal work is premature, and that an award of attorney fees is generally premature given the allegations of fraud.

**Conclusions of Law**

*1. Plaintiff's Motion Against the Fraud and Negligence Penalties*

In her motion for summary judgment, plaintiff Beat argues that the court should dismiss the fraud penalty imposed against her. She notes that to support such a penalty, the government has the burden to show fraud by clear and convincing evidence. *Heyen v. United States*, 945 F.2d 359, 364–65 (10th Cir. 1991) (citing *Zell v. C.I.R.*, 763 F.2d 1139, 1142–43 (10th Cir. 1985)).

In her motion, Beat contends that no such clear and convincing evidence exists, citing a variety of factors. such a the monogamous nature of the relationship, and the fact that she and Dyche were "known throughout the community as a couple, if not a married couple, and were known

publicly to be always together." (Dkt. 65, at 33). Beat also emphasizes she "has consistently testified she believed she and Dyche were common-law married." *(Id.)*. She further argues that an award of fraud cannot stand "[i]n light of the Kansas Court of Appeals decision," (*id. at 38*), and cites various facts noted in the course of that decision. Finally, she argues that the fraud claim should be dismissed because she relied in good faith on the advice of her attorneys.

The court finds that summary judgment on the issue should be denied. Under Kansas law, a common-law marriage arises when a man and woman each have the capacity to marry; (2) they mutually agree to be presently married; and (3) they hold themselves out to the public as husband and wife. *Fleming v. Fleming*, 221 Kan. 290, 559 P.2d 329, 331 (1977). The evidence submitted to the court would permit a rational fact-finder to conclude that no common-law marriage existed, and further that the evidence for such a relationship was so lacking that Beat's claim could be considered fraudulent.

The various factors cited by Beat in support of her motion are factors which also are consistent with any long-term monogamous romantic cohabitation, even in the absence of any marital intent. Further, however much Beat may stress that she has consistently *testified* that she believes she was common-law married, this does not change the fact that such testimony of course occurred only after Dyche's death. There remains a striking lack of evidence indicating such marital intent during Dyche's life. To the contrary, there is a substantial body of evidence indicating that Beat and Dyche took pains to *avoid* giving any indication of marriage to their close family members. Beat acknowledged that she and Dyche took pains to conceal the relationship from neighbors and close relatives. There is evidence indicating that, when Dyche gave indications of some marital intent, it was in an explicitly joking (as when he introduced Beat as his wife at the VFW) or

otherwise potentially ironic manner.

As noted earlier, Beat has emphasized the "honeymoon" to Hutchinson at approximately the time when their divorces became final, But there is an absence of any evidence showing that Dyche had any present intention to then be married to Beat. More importantly, Beat herself has testified that Dyche later proposed to her on two separate occasions. (Beat turned him down). There would have been no need to do so if Dyche had thought they were already married. Further, while Beat emphasizes that she has consistently testified she believed she was common-law married, the court must also note the inconsistency between such testimony and the consistent manner in which Beat and Dyche conducted their business and economic activities during Dyche's life. Consistently over the course of many years, Beat and Dyche represented in their tax returns, in their conveyances of real property, and in other business dealings that they were not married. In this respect, the court notes the uncontroverted evidence showing that Dyche was knowledgeable and sophisticated in his business relationships, and the evidence from his long-time attorney who testified that Dyche was fully aware that the absence a martial relationship with Beat would create a substantial estate tax penalty, but that he accepted that cost and did not consider himself married.

Finally, of course, much of plaintiff's argument rests on the weight to be assigned her own testimony that she believes she was common-law married. Against this, as noted above, there is a substantial body of evidence showing that this belief arose only after Dyche's death. Further, from the point of view of the weight of the evidence, that putative belief arose after Beat was informed that over a million dollars in estate taxes might be avoided if she were the common-law wife of Dyche. Prior to learning the financial stake involved, Beat told the funeral home that she was Dyche's "companion" rather than his "wife."

Most importantly, however, the assessment of the credibility of testimony and the weight of evidence is reserved for the trier of fact. In the context of the present motion by plaintiff, the court must interpret all of the evidence in the light most favorable to the defendant, and this includes evidence which could lead a reasonable fact-finder to doubt the credibility of plaintiff's testimony.

As noted earlier, the decision of the Kansas Court of Appeals is not controlling here. The decision there occurred after the trial court had granted summary judgment against Beat. Accordingly, the court of appeals was required to render all fact inferences *in Beat's favor*. As just noted, since it is Beat who has moved for summary judgment, the court must here render all possible fact inferences *in favor of the government*. Further, the evidentiary record before this court is not identical to that submitted in the state court action. Accordingly, the state decisions are not controlling here, and the court independently determines that summary judgment is not justified.

Beat argues that she acted in good faith in advancing the claim of common-law marriage, and was following the advice of her attorneys. *See* 26 U.S.C. § 6664(c)(1) (providing for no penalty where taxpayer "acted in good faith"); *Van Scoten v. Commissioner*, 439 F.3d 1243, 1253 (10th Cir. 2006) (applying defense based on reliance on professional advice"). Accordingly, she argues, the court should award summary judgment both as to the fraud penalty (Dkt. 77, at 38-40), and the I.R.C. § 6662 negligence penalty for underpayment. (*Id*. at 41-42). *See also American Boat Co. v. United States*, 583 F.3d 471 (7th Cir. 2009) (reliance under § 6664 "is a fact-specific determination with many variables").

The court will deny the relief sought. Beat bears the burden of proof on both issues. *Van Scoten*, 439 F.3d at 1258 (the government's negligence finding "is presumptively correct"); *Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 548 (5th Cir. 2009) (taxpayer invoking § 6664(c)

good faith defense has burden of proof). Here, a rational finder of fact could determine that Beat has failed to show she is entitled to either defense. First, the court notes the existence of all of the evidence previously cited showing the lack of any present marital relationship between Beat and Dyche. Second, there is other evidence potentially relevant to the claims of good faith and negligence. Specifically, the court notes the decision to change accountants may have been prompted precisely by the desire to conceal conflicting evidence about the supposed "marriage." That is, Beat stopped using Jim Hill, the accountant who had consistently worked for her and Dyche but who did not believe Beat and Dyche were married, substituting another accountant who had no experience in tax returns for farming operations.

In addition, there is evidence from which a rational finder of fact could conclude that the plaintiff failed to fully inform her counsel of evidence which would undercut her claim of a common-law marriage. As noted earlier, David Gaumer, Dyche's long-term attorney, testified that he visited with the plaintiff after Dyche's death and expressly told her that no common-law marriage existed. Beat denies that this conversation occurred, but the conflict between the witnesses should be resolved by the jury. If the fact-finder believes Gaumer, it may also conclude that Beat concealed that information from her attorneys, and is not entitled to the good faith defense or a finding of mere negligence. Even if the fact-finder finds that this conversation did not occur precisely as Gaumer testified, it remains striking that apparently no attempt was made to contact Gaumer, who was in a key position to supply information to any party wishing to conduct a reasonable and good faith exploration of whether a common-law marriage existed.

## 2. The Duty of Consistency

The government argues that whether or not a trier of fact ultimately finds that a common-law marriage existed, the martial deduction is not available, because Beat as Executor of the Estate is estopped from obtaining the benefit of the deduction under the duty of consistency.

"The doctrine applies where a taxpayer makes a representation or report, on which the Commissioner has relied, and with respect to which the taxpayer attempts to change his or her position after the running of the statute of limitations." *LeFever v. Commissioner*, 100 F.3d 778, 789. *See also Janis v. Commissioner*, 461 F.3d 1080, 1086 (9th Cir. 2006); *Ashman v. Commissioner*, 231 F.3d 541, 545 (9th Cir. 2000); *Eagan v. United States*, 80 F.3d 13, 16 (1st Cir. 1996); *Herrington v. Commissioner*, 854 F.2d 755, 758 (5th Cir. 1988).

"The duty of consistency is a type of equitable estoppel, also known as 'quasi-estoppel.'" *Eagan*, 80 F.3d at 17. However, unlike traditional estoppel, application of the duty of consistency does not require proof of intentional misrepresentation by the taxpayer. As the court noted in *LeFever*,

> dispensing with this culpability factor fosters better tax administration and reduces unpredictability otherwise produced by the decisions attempting to assess relative blame between the taxpayer and the IRS. It is a better rule to preclude a taxpayer from changing his or her position based on the taxpayer's having received a tax benefit on the basis of a specific representation made to the IRS in an earlier year than to require a showing of an intentional misrepresentation or wrongful misleading silence by the taxpayer. The relative fault of the parties is less important in a case in which the public, and not just the two parties, has an interest.

100 F.3d at 787 (citations and footnote omitted).

The government contends that the doctrine applies here because Dyche and Beat consistently represented in their tax returns that they were single, the IRS relied on those representations, and after Dyche's death, Beat has attempted to change those representations after the statute of

limitations has run.

Beat does not argue that either the first or third elements of the duty of consistency are absent. Instead, she argues that the element of reliance is not present. Distinguishing cases cited by the government, the plaintiff argues that the present case is different because the prior "single" and "head of household" are not "mutually exclusive" to the "ultimate claim" of marriage, and Dyche's filings "did not represent that at the time of his death he would not be married." (Dkt. 70 at 17-18). She also stresses that the representations involved "different taxes" – income tax and estate tax. She argues (*id*. at 18-20) that reliance should not be found because the government has not shown that she and Beat did in fact gain an economic advantage by filing unmarried returns, and because any such advantage, "at most $15,000," is greatly disparate to the estate taxes in the event the doctrine is applied. Finally, she argues that the IRS's failure to challenge the joint 2001 tax return "plainly belies" and "fatally undermines" the government's claim of reliance.

In addition to these reliance arguments, Beat also argues generally that the doctrine should not be applied, first, because her error was an error of law (mistakenly believing marriage required "this piece of paper"), and the doctrine does not apply to a mistake of law. *LeFever*, 1000 F.3d at 788.

The latter argument is not a sufficient basis for excluding application of the duty of consistency. While Beat now claims that she did not understand the law, the existence of the elements of a common-law marital relationship are fact questions under Kansas law. *Sullivan v. Sullivan*, 196 Kan. 705, 413 P.2d 988 (1966). Beat's argument is similar to that presented in *LeFever*, where the petitioners argued that they had made a mistake of law in their prior representations made in taking the special use valuation. The court rejected the argument:

While the determination of whether particular property qualifies for the special use valuation election involves issues of law, the validity of Petitioners' election with regard to parcels 2 through 5 turns on the facts regarding the actual use of the parcels. **The relevant rule of law is undisputed**. Cash rental of farmland to a nonfamily member does not constitute a qualified use. As the Tax Court noted, **the facts regarding the actual use of the parcels were peculiarly within the knowledge of Petitioners. At best, Petitioners' representations involve a mixed question of law and fact to which the duty of consistency may be applied.**

100 F.3d at 788 (emphasis added, citations omitted). Here, the relevant rule of law is also undisputed: the marital estate tax deduction is reserved for couples who are, in fact, married. The facts regarding the actual relationship between Dyche and Beat were peculiarly within their knowledge during Dyche's life, and during that life they consistently indicated as a fact in their federal tax returns that they were not married. At most Beat has shown that the representations represent a mixed question of law and fact, to which the doctrine of consistency applies. *See Eagan*, 80 F.3d at 17.

The court finds several of Beat's other arguments – that application of the claim is precluded by the failure to audit the 2001 return, and by the disparity between the amount gained by the "single" income tax filings versus the "married" estate tax deduction – reflect attempts to add elements to the duty of consistency which are not present in the doctrine, and which are contrary to the law. As noted earlier, the duty of consistency arises when the taxpayer attempts to alter material representations relied upon by the IRS after the statute of limitations has passed. The fact that the taxpayer's most recent returns are available for challenge does not prevent the application of the doctrine where the returns for earlier years are barred by the statute of limitations. *Eagan*, 80 F.3d at 18.

Further, application of the doctrine should not be precluded merely because the taxpayer can show that she would accrue a sufficiently large windfall by repudiating her earlier representations,

markedly in excess of the benefits she obtained by those representations. As the Fifth Circuit noted in *Alamo Nat'l Bank v. Commissioner*, 95 F.2d 622, 623 (5th Cir.), cert. denied, 304 U.S. 577 (1938), the doctrine exists so that a taxpayer may not "blow hot and cold as suits his interest." It is not the function of the court to measure the temperature and allow the taxpayer to change positions if the new one yields a given result. Plaintiff cites no authority which would support avoidance of the doctrine under such circumstances.

Accordingly, the question turns on whether the government has demonstrated that it relied on the consistent representations by Beat and Dyche that they were not married. The court finds that the government has demonstrated that the doctrine should apply here.

For two decades, both Beat and Dyche consistently represented in their federal tax returns that they were not married. They either filed as "single," or, in the case of Beat while she had children in the home, as "head of household," a filing status which is available only to persons who are not married at the end of the taxable year. I.R.C. § 2(b)(1). The government relied on these representations by accepting those returns without audit until after the statute of limitations passed. As established by Revenue Agent TenEyck's report, Beat and Dyche gained material advantages by filing as unmarried persons, avoiding the so-called "marriage penalty."

Beat correctly notes that TenEyck's evidence does not establish precisely the amount she and Dyche saved by filing as "unmarried," but this is a function of the fact that records for the earlier years are not available. The duty of consistency exists precisely because the statute of limitations forecloses the IRS from recovering amounts due for earlier years. *Herrington*, 854 F.2d at 757. Further, as noted earlier, no authority supports the proposition that the duty of consistency is excused if the amounts gained by the taxpayer's earlier representations are much smaller than the

ultimate windfall gained by repudiating those representations. The duty arises where it is shown that the taxpayer obtained a non-negligible benefit by her earlier representations, and the IRS accepts these representations until the statute of limitations passes.

The government has made such a showing here, and the court finds that Beat's arguments related to reliance are without merit. As noted earlier, she argues that the earlier "single" and "head of household" tax returns do not necessarily represent that the couple would not be married in 2001. (Dkt. 70 at 17-18). But this inaccurately states Beat's contentions as to the putative common-law marriage. She does not claim that the common-law marriage suddenly arose just before Dyche's death in 2001. Indeed, given the legal elements of common-law marriage under Kansas law (which include consistently holding out an appearance of marriage to the community), she could not do so. Instead, she must and has claimed that the relationship existed for some time. Specifically, she has alleged that the relationship arose as early as the Hutchinson "honeymoon" in the earlier 1980s. Accordingly, the consistent representation by Dyche and Beat in their tax returns that they were not married is indeed directly inconsistent with the position that Beat has advanced after Dyche's death.

And even though Beat as Executor of the Dyche Estate is technically distinct from Beat the sole beneficiary of that estate, the fact remains that Beat, Dyche, and the Estate all have virtually identical economic interests in tax avoidance. *See LeFever*, 100 F.3d at 788 ("duty of consistency" applies to "both the taxpayer and parties with sufficiently identical economic interests"). Nor may Beat escape the duty of consistency merely because her inconsistent representations were advanced to minimize different taxes. Beat supplies no authority for such a proposition. Rather, as noted above the doctrine applies whenever the elements are present – that is, after the statute of limitations, a taxpayer seeks to alter previous representations on which the IRS has relied in assessing taxes. The

duty of consistency is "an equitable responsibility to report transactions which have an impact upon different taxable periods *or different taxes* in a consistent manner." *Hess v. United States*, 537 F.2d 457, 464 (Ct.Cl. 1976) (emphasis added).

### 3. Estate Expenses

The plaintiff has filed a separate motion for summary judgment, seeking an award of expenses incurred by the Estate in connection with administrative expenses. Specifically, the plaintiff seeks designated amounts incurred for executor, accounting, interest, and attorney fees. The government does not oppose plaintiff's motion, with one exception. The government objects to an award of attorney fees at the present time because some of the attorneys fees cited in plaintiff's motion have not yet been actually incurred, and because a potential finding of fraud by the plaintiff would be relevant to the court's discretion in calculating the award of attorney fees.

The plaintiff argues that the court should grant summary judgment as to all of the non-attorney fee claims, as well as to those attorney fees for work already incurred ($864,488.05), citing (Dkt. 68 at 6-7) cases holding that litigation fees of an estate action for refund are generally deductible, even if the litigation is ultimately unsuccessful and the effect of the refund would be to benefit a beneficiary. *See Levine v. United States*, 10 Cl.Ct. 135, 142 (1986); *Rothgery v. United States*, 475 F.2d 591 (Ct. Cl. 1973); *Cleveland v. Higgins*, 148 F.2d 722 (2nd Cir. 1945), *cert. denied*, 326 U.S. 722 (1945); *Old Colony Trust Co. v. United States*, 300 F. Supp. 1032 (D. Mass. 1969); *Street v. United States* , 310 F.Supp. 657 (S.D. Tex. 1969); *Altendorf v. United States*, 228 F.Supp. 969 (D.N.D. 1964); *Howell v. Dudley*, 154 F. Supp. 571 (W. D. Pa. 1957). In its Reply,

plaintiff emphasizes generally that it has "presented numerous cases establishing the legal principal that the reasonableness of attorneys' fees is not determined by the ultimate success of a refund action," specifically referencing *Rothgery* as an example, and contends that the government "does not and indeed cannot distinguish these cases." (Dkt. 76 at 3-4).

In fact, the cases are distinguishable. In *Rothgery*, the court noted that the parties had "stipulated that plaintiff is entitled to recover such amount as results from allowing a deduction for reasonable fees and expenses," and stressed that "[t]here is certainly no evidence in the record indicating 'fraud or collusion'" in the action. 475 F.2d at 597 and n.1. Similarly, there was no allegation of fraud in any of the other seven cases cited by plaintiff. In contrast, courts have generally recognized the decisions of state probate courts as to the compensation for estate expenses, including attorney fees, "in a proceeding untainted by fraud." *United States v. White*, 650 F.Supp. 904 (W.D.N.Y. 1987) (quoting *Commissioner v. Estate of Bosch*, 387 U.S. 456, 481 (1967) (Harlan, J., dissenting)), *reversed on other gds.*, 853 F.2d 107 (2d Cir. 1988).

In advancing its request for deduction, the Estate cites 26 C.F.R. § § 20.2053-3(a), which provides that attorney's fees of an estate may be deductible if they are "actually and necessarily" incurred in the settlement of the estate. Subsection (c), governing attorney fees, provides such fees are "deductible to the extent permitted by § 20.2053-1." That provision, in turn, specifically requires that deductions under 26 U.S.C. § 2053(a) are available only if the expenses "are bona fide in nature." 26 C.F.R. § 2053-1(b)(2). Good faith is an essential ingredient of a claim for expenses under 20.2053-3(a). *Estate of Trompeter v. Commissioner*, 111 T.C. No. 2, 111 T.C. 57 (1998) ("legal and other fees and costs" not deductible where "not incurred in the good faith administration of the estate but for the benefit of the beneficiaries"), *vacated on other gds.*, 279 F.3d 767 (9th Cir.

2002).

Accordingly, the court finds that an award of attorney fees at the present time is premature. As noted earlier, material questions of fact exist as to whether the claim of common-law marriage was advanced in good faith and free from fraud.

The court will grant summary judgment to plaintiff in the requested amounts (Dkt. 68 at 4) for accountants' fees, executor's commissions, and interest expenses. Plaintiff's motion seeking a deduction for attorney fees is denied without prejudice.

IT IS ACCORDINGLY ORDERED this 25th day of August, 2010 that the plaintiff's First Motion for Partial Summary Judgment (Dkt. 62) is denied; plaintiff's Second Motion (Dkt. 67) is granted in part and denied without prejudice in part as provided herein; defendant's Motion for Partial Summary Judgment (Dkt. 63) is granted.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE